UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,

          Plaintiff,

v.

DAVONE MONTRAIL JOHNSON,

          Defendant.

Case No. 23-cr-65 (JNE/LIB)

**ORDER AND
REPORT AND RECOMMENDATION**

This matter comes before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. § 636 and Local Rule 72.1, upon the parties' various Motions for the discovery and production of evidence, [Docket Nos. 20, 26, 27, 28, 29, 30], and upon Defendant Davone Montrail Johnson's ("Defendant") Motion to Suppress Search and Seizure. [Docket No. 31].

The Court held a Motions Hearing on the parties' pretrial motions. Upon the request of the parties, supplemental Memorandums regarding Defendant's Motion to Suppress Search and Seizure, [Docket No. 31] were later filed by Defendant, [Docket No. 41], and the Government, [Docket No. 51]. The motions were taken under advisement following completion of the post-hearing briefing.

For the reasons discussed herein, the Government's Motion for Discovery, [Docket No. 20], is **GRANTED**. Defendant's Motion for Disclosure of 404(b) Evidence, [Docket No. 26]; Defendant's Motion to Compel Attorney for the Government to Disclose Evidence Favorable to the Defendant, [Docket No. 27]; and Defendant's Motion to Retain Rough Notes, [Docket No. 30], are **GRANTED**. Defendant's Motion for Disclosure and to Make Informant Available for

Interview, [Docket No. 28]; and Defendant's Motion for Disclosure of Jencks Act Material, [Docket No. 29], are **DENIED**.

Further, it is recommended that Defendant's Motion to Suppress Search and Seizure, [Docket No. 31], be **DENIED**.

## I.     Background

Defendant is charged with one (1) count of conspiracy to possess with intent to distribute fentanyl in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846.  (Indictment [Docket No. 1]).

## II.     Government's Motion for Discovery. [Docket No. 20].

The Government seeks discovery pursuant to Rules 16(b), 12.1, 12.2, 12.3, and 26.2 of the Federal Rules of Criminal Procedure, as well as, Rules 702, 703, and 705 of the Federal Rules of Evidence.  (<u>See</u> Gov't Mot. for Discovery [Docket No. 20]).

### A.  Inspection and Copying Pursuant to Rule 16(b)

#### 1.  Documents and Tangible Objects

The Government requests that the Court order Defendant to permit inspection and copying of all books, papers, documents, photographs, tangible objects, or copies or portions thereof, which are within the possession, custody, or control of Defendant and which Defendant intends to introduce as evidence in his case-in-chief at trial.

Defendant did not object to the request. The motion is granted, and Defendant shall disclose any such responsive materials no later than fourteen (14) calendar days before trial.

#### 2.  Reports of Examinations and Tests

The Government further requests all results and reports of physical or mental examinations and of scientific tests or experiments made in connection with the above-captioned

matter, or copies thereof, within the possession or control of Defendant, which Defendant intends to introduce as evidence in his case-in-chief at trial or which were prepared by a witness whom Defendant intends to call at trial.

Defendant did not object to the request. The motion is granted, and Defendant shall disclose any such responsive materials no later than fourteen (14) calendar days before trial.

### 3. Expert Testimony

The Government also seeks a written summary of expert testimony Defendant intends to use under Rules 702, 703, and 705 of the Federal Rules of Evidence as evidence at trial. The Government asserts that the summary must describe the opinions of the expert witnesses, the basis and reasons thereof, and the witnesses' qualifications.  The Government requests that such expert disclosures for both parties be made thirty (30) days before trial, with rebuttal expert reports being produced no later than ten (10) days before trial.

The Government's request for an Order directing Defendant to disclose a written summary of expert testimony Defendant intends to use as evidence at trial is, however, partially moot. In compliance with Federal Rule of Criminal Procedure 16(a)(1)(G), the Court previously issued an Order, [Docket No. 22], directing the parties to disclose the identity of any case-in-chief expert witness they intend to use and make those expert disclosures required by Federal Rule of Criminal Procedure 16 no later than twenty-eight (28) calendar days before trial; and to make any rebuttal expert disclosures thereto no later than ten (10) days before trial.

Accordingly, to the extent the Government's Motion for Discovery, [Docket No. 20], seeks an Order of this Court requiring Defendant to disclose a written summary of expert testimony Defendant intends to use under Rule 702, 703, and 705 of the Federal Rules of

Evidence as evidence at trial, the Government's Motion for Discovery, [Docket No. 20], is **GRANTED** consistent with the Court's prior Order on expert testimony. [Docket No. 22].

### B.    Notice of Alibi Defense

Pursuant to Federal Rule of Criminal Procedure 12.1, the Government seeks an Order from the Court requiring Defendant, if he intends to claim alibi as a defense, to state the specific place or places at which Defendant claims to have been at the time of the alleged offenses in the above-captioned matter and the names and addresses of the witnesses upon whom Defendant intends to rely on to establish such alibi.

Defendant did not object to this request.  The motion is granted, and Defendant shall give notice of same pursuant to Rule 12.1 as soon as practicable and in no event later than twenty-one (21) calendar days before trial.

### C.    Notice of Insanity/Mental Illness Defense

In addition, pursuant to Federal Rule of Criminal Procedure 12.2, the Government requests the Court to order Defendant, if he intends to rely upon the defense of insanity or introduce expert testimony relating to a mental disease or defect or any other mental condition of Defendant relevant to the issue of guilt, to provide the Government notice of such defense.

Defendant did not object to this request.  The motion is granted, and Defendant shall give notice of same pursuant to Rule 12.2 as soon as practicable and in no event later than twenty-one (21) calendar days before trial.

### D.    Notice of Public Authority

Pursuant to Federal Rule of Criminal Procedure 12.3, the Government seeks an order from the Court requiring Defendant, if he intends to rely upon the defense of actual or believed exercise of public authority on behalf of a law enforcement agency or federal intelligence agency

at the time of the offense, to notify the Government and the Court no later than the date of the first hearing on pretrial motions.

Defendant did not object to this request.  The motion is granted, and Defendant shall give notice of same pursuant to Federal Rule of Criminal Procedure 12.3 as soon as practicable and in no event later than twenty-one (21) calendar days before trial.

### E.  Witness Statements

The Government seeks all statements within Defendant's possession or control of any witness that Defendant intends to call in connection with a suppression hearing, detention hearing, trial, or sentencing pursuant to Rule 26.2 of the Federal Rules of Criminal Procedure.

Defendant did not object to this request.  The motion is granted.  To the extent Defendant has statements in his possession or control of any witness that he intends to call to testify in connection with a suppression hearing, detention hearing, trial, or sentencing, Defendant shall disclose such statements to the Government no later than three (3) calendar days before such witness is called to testify.

### III.    Defendant's Pretrial Motion for Disclosure of 404(b) Evidence.  [Docket No. 26].

Defendant seeks immediate disclosure of any "bad act" or "similar course of conduct" evidence that the Government intends to offer at trial pursuant to Federal Rule of Evidence 404(b).  (See Def.'s Pretrial Mot. for Disclosure of 404(b) Evidence [Docket No. 26]).

In its written response, the Government acknowledged its obligation to comply with Rule 404(b), and it represented that it will continue to comply with its obligations. (Gov.'s Consolidated Response to Johnson's Pretrial Mots. [Docket No. 32] at 3).  The Government suggested that disclosures regarding Rule 404(b) evidence be made no later than two (2) weeks before trial. (Id.).

In relevant part, Rule 404(b)(3) provides that the Government must "provide reasonable notice of any" Rule 404(b) "evidence that the prosecutor intends to offer at trial, so that the defendant has a fair opportunity to meet it."  Fed. R. Evid. 404(b)(3)(A).  In that notice, the Government must also "articulate . . . the permitted purpose for which the prosecutor intends to offer the evidence and the reasoning that supports the purpose."  Fed. R. Evid. 404(b)(3)(B).

Defendant's Pretrial Motion for Disclosure of 404(b) Evidence, [Docket No. 26], is **GRANTED**. The Court orders the Government to disclose to the Defense as soon as practicable, and in no event later than two (2) weeks before trial, formal notice of any specific 404(b) evidence it intends to offer, as well as the purpose for which it intends to offer it into evidence at trial.[1]

## IV.    Defendant's Pretrial Motion to Compel Disclosure of Evidence Favorable to the Defendant.  [Docket No. 27].

Defendant seeks disclosure of evidence favorable to him which would fall within the authority of Brady v. Maryland, 373 U.S. 83 (1963); Giglio v. United States, 405 U.S. 150 (1972); and their progeny.  (Def.'s Pretrial Mot. to Compel Disclosure of Evidence Favorable to the Defendant [Docket No. 27]). Defendant seeks, among other things, any statements of any witnesses exculpating him, along with any related reports of interviews of these witnesses; or any statements of witnesses, which contradict statements of other witnesses, along with any related reports of interviews of these witnesses; any prior conviction of prospective Government witnesses; and any offers or promises made to prospective government witnesses to induce their cooperation against Defendant whether or not the Government intends to call those persons as witnesses. (Id.).  Defendant also seeks any photographs used by the Government agents in their

---

[1] Federal Rule of Evidence 404(b) does not extend to evidence of acts which are "intrinsic" to the charged offense. United States v. Adediran, 26 F.3d 61, 63 (8th Cir. 1994) (standards applicable to evidence considered under Rule 404(b) do not apply to such "inextricably intertwined" evidence); see United States v. Williams, 900 F.2d 823 (5th Cir. 1990).

investigation to identify him and all pieces of identification bearing his name in combinations different than that appearing on the caption of the Indictment. (Id.).

The Government, acknowledging its duty to disclose responsive materials and information, represented that it has previously disclosed evidence favorable to the Defendant within its possession and will continue to comply with its obligations under Brady, and its progeny.  (Gov.'s Consolidated Response to Johnson's Pretrial Mots. [Docket No. 32] at p. 4).  The Government objects to Defendant's Motion to the extent he seeks materials beyond the requirements of Brady, Giglio, and their progeny. (Id.).  As for prospective trial witnesses, the Government represented that it does not yet know which witnesses it intends to call at trial. (Id.).

Defendant's Pretrial Motion to Compel Disclosure of Evidence Favorable to the Defendant, [Docket No. 27], is **GRANTED**.  The Government will disclose any and all remaining and/or subsequently discovered, obtained, or obtainable material responsive to Brady to the Defense as soon as said responsive materials are discovered by the Government.[2]  As for materials that are responsive to Giglio and related to the impeachment of the Government's witnesses to be called at trial, the Government will disclose responsive materials no later than (a) seven (7) days before trial or (b) when the presiding trial judge requires disclosure of the Government's trial witness list, whichever is earlier.[3]

---

[2] Defendant's Motion purportedly seeks to list various items that Defendant believes are categorized as responsive materials under Brady, and Defendant asks the court to order the disclosure of these specific materials– ostensibly after making a finding that said materials are responsive to Brady. To the extent Defendant makes such a request, that request is denied. The Court notes that, in Kyles v. Whitley, 514 U.S. 419 (1995), the United States Supreme Court "emphasized the discretion of the *prosecutor*, not the trial judge, in deciding what evidence is producible under Brady." United States v. Garrett, 238 F.3d 293, 304 n.4 (5th Cir. 2000) (emphasis added). The Sixth Circuit has also explained that "while the Brady rule imposes a general obligation upon the government to disclose evidence that is favorable to the accused and material to guilt or punishment, the government typically is the sole judge of what evidence in its possession is subject to disclosure." United States v. Clark, 957 F.2d 248, 251 (6th Cir. 1992). That being said, "[i]f [the Government] fails to comply adequately with a discovery order requiring it to disclose Brady material, it acts at its own peril."  Id.  Accordingly, the Court encourages the Government to carefully evaluate the materials in its possession in light of a liberal understanding of its Brady obligations.

[3] The Government's disclosure of materials responsive to Giglio and related to the impeachment of the Government's witnesses to be called at trial shall include the criminal history, if any, for each trial witness.

**V.    Defendant's Pretrial Motion to Disclose and Make Informants Available for Interview. [Docket No. 28].**

Defendant requests an Order from the Court compelling the Government to disclose the identity of any informant or informants utilized by the Government in its investigation, and to make such informants available for interview by Defendant's attorney.  (Def.'s Pretrial Mot. to Disclose and Make Informants Available for Interview [Docket No. 28]).

In its written response, the Government represents that it does not anticipate calling any confidential informants as trial witnesses.  (Gov.'s Consolidated Response to Johnson's Pretrial Mots. [Docket No. 32] at pp. 5-6).  However, should any informants be identified as trial witnesses, the Government agreed to disclose the informant's name three (3) days prior to trial and <u>voluntarily</u> agreed to provide all Jencks Act and <u>Giglio</u> material to the Defense by no later than three (3) days before trial.  (<u>Id.</u>).

Although the Government agreed to identify testifying informants three days prior to trial, the Defense did not request testifying informants. Instead, Defendant requests the identity of all informants regardless of whether they are testifying. The Government made no agreement as to these informants.

The Government relies on the "Informer's Privilege" in support of its argument that it is allowed "to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law." <u>Roviaro v. United States</u>, 353 U.S. 53, 59 (1957) (citations omitted).  However, there are several exceptions to the privilege.  <u>Id.</u>  Of those, the one pertinent to the present case considers the "fundamental requirements of fairness" and a defendant's need to prepare an adequate defense.  <u>See Id.</u> at 60-61 ("Where the disclosure of an informer's identity . . . is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way.").

8

"[T]here is no litmus test for determining when disclosure [of an informant's identity] is required[.]" United States v. Lapsley, 334 F.3d 762, 764 (8th Cir. 2003); see also Roviaro, 353 at 62 ("We believe that no fixed rule with respect to disclosure is justifiable."). However, the Eighth Circuit has indicated a court ruling on a motion for disclosure of an informant's identity "must weigh the defendant's right to information against the government's privilege to withhold the identity of its confidential informants." Lapsley, 334 F.3d at 763–64 (internal quotation marks and citations omitted).

Here, that balance is best served by requiring the Government to disclose to Defendant only the identity of any informant whose testimony the Government intends to introduce at trial in the present case or whose identity is otherwise discoverable under Brady, Giglio, and their progeny, or the Government's other discovery obligations. The Government will not now be required to disclose the identity of "any informant or informants utilized by the government" in the investigation of the present case. To the extent the Government agreed to provide disclosures regarding Giglio and Jencks Act materials, this was separately requested by Defendant and is best addressed above and below.

Therefore, Defendant's Pretrial Motion to Disclose and Make Informants Available for Interview, [Docket No. 28], is **DENIED**. If the Government determines that it will use any confidential informants as witnesses at trial, the Government shall disclose the identity of such informants and make them available to the Defense no later than (a) seven (7) days before trial or (b) when the presiding trial judge requires disclosure of the Government's trial witness list, whichever is earlier.

## VI.    Defendant's Motion for Early Disclosure of Jencks Act Material. [Docket No. 29].

Defendant moves the Court for an Order requiring the Government to disclose Jencks Act materials at least two weeks before trial.  (Def.'s Mot. for Early Disclosure of Jencks Act Material, [Docket No. 29]).

The Government objects to Defendant's motion arguing that it cannot be <u>required</u> to make pretrial disclosure of Jencks Act materials.  (Gov.'s Consolidated Response to Johnson's Pretrial Mots., [Docket No. 32], at pp. 6-7).

The Court recognizes the practical effect that disclosing Jencks Act materials only after a witness has actually testified in the Government's case-in-chief creates the prospect for unnecessary continuances and delays in the trial while the Defense is permitted a reasonable time to review the late disclosures.  However, Defendant provides no citation to authority that would allow the Court to <u>require</u> early disclosure of Jencks Act material.  Generally, the case law provides that the Court may <u>not</u> require the Government to make early disclosure of Jencks Act material.  <u>See, e.g.</u>, <u>United States v. Alexander</u>, 736 F. Supp. 968, 981 (D. Minn. 1990); <u>United States v. White</u>, 750 F.2d 726, 727 (8th Cir. 1984); <u>United States v. Wilson</u>, 102 F.3d 968, 971–72 (8th Cir. 1996).

Accordingly, Defendant's Motion for Early Disclosure of Jencks Act Materials, [Docket No. 29], is **DENIED**.[4]

## VII.   Defendant's Pretrial Motion for Government Agents to Retain Rough Notes and Evidence. [Docket No. 30].

Defendant requests an Order from the Court requiring any law enforcement agent, including confidential informant, to retain and preserve all rough notes taken as part of their investigations, whether or not the contents of such rough notes are incorporated in official

---

[4] However, the Government <u>voluntarily</u> agreed to provide all Jencks Act material to the Defense by no later than three (3) business days before trial. (Gov.'s Consolidated Response to Johnson's Pretrial Mots., [Docket No. 32]). The Court encourages such voluntary agreements.

records.  (See Def.'s Pretrial Mot. for Gov. Agents to Retain Rough Notes and Evidence, [Docket No. 30]). In addition, Defendant reeks the retention of evidence that is directly relevant to issues relating to Defendant as well. Id.

The Government does not object to Defendant's request for the retention of rough notes and evidence.  (Gov.'s Consolidated Response to Johnson's Pretrial Mots., [Docket No. 32], at pp. 3-4).

Defendant's motion is granted regarding rough notes as to retention only at this time.  If Defendant seeks production or disclosure of rough notes, he will need to bring a separate motion for such production. Defendant's motion is also granted as to evidence seized in the course of the investigation. Evidence seized in the course of investigation shall be produced as required by the Federal Rules of Criminal Procedure or other order of this Court.

## VIII.    Defendant's Pretrial Motion to Suppress Search and Seizure. [Docket No. 31].

Defendant moves the Court for an Order suppressing any evidence obtained from the search and seizure of a black Dodge Charger (the "Dodge Charger" or the "car") in which Defendant was a passenger.  (Motion to Suppress Search and Seizure [Docket No. 31]).

### A.  Statement of Facts[5]

The record presently before the Court indicates that, on the evening of June 2, 2022, Minnesota State Patrol Trooper Seth Kuhn  (hereinafter "Trooper Kuhn") testified he observed a black Dodge Charger speeding northbound on County Road 36 at roughly 70 miles per hour in the 55 mile per hour zone. (Tr. 7, 13; see Gov't Ex. 4, at 0:00:47-0:00:53)[6]. Trooper Kuhn

---

[5] The facts contained in this section are derived from the parties' testimony and exhibits presented during the motion hearing for this case.

[6] Throughout this Order and Report and Recommendation, the Court refers to the transcript of the June 23, 2023, Motions Hearing by the abbreviation "Tr." (Transcript [Docket No. 37]).

activated his emergency lights to initiate a traffic stop of the vehicle. (See Gov't's Ex. 4, at 0:00:00-0:01:46). The vehicle stopped on the shoulder of the road. (Id.).

Trooper Kuhn approached the vehicle, and while standing alongside the car, he observed five occupants in the vehicle. The driver was William Robinson. (Tr. 16). The front-seat passenger was later identified as Theresa Reese. (Id.). In the rear seat of the vehicle respectively, starting from the driver's side, Trooper Kuhn observed Tierra Cook, the three-month-old infant child of Cook and Defendant, and the Defendant, Davone Montrail Johnson. Trooper Kuhn testified that of the car's five occupants, none were the registered owners of the vehicle according to the license plate check that he ran before approaching the vehicle.[7]

After Trooper Kuhn explained to Mr. Robinson the reason why he had initiated the traffic stop, he then inquired who the car belonged to. (Tr. 18; Gov't's Ex. 4, at 0:02:16-0:03:20). Mr. Robinson told the officer that it was Ms. Cook's car. (Tr. 19; Gov't's Ex. 4, at 3:15). During his interaction with the driver, Trooper Kuhn noticed that Mr. Robinson was quite nervous and testified that Mr. Robinson was "tapping his leg up and down," had a visible "carotid pulse in his neck," had "rapid, accelerated speech," and was "unsure in some of his answers." (Tr. 22; See Gov't's Ex. 4, at 0:07:15). In his testimony, Trooper Kuhn noted that the car smelled strongly of air fresheners as if attempting to mask the scent of something else. (Tr. 23) In addition, he testified that there were many fast-food wrappers and containers littering the floor of the car. (Tr. 24).

The driver stated he was traveling to Bemidji from St. Michael. Trooper Kuhn testified that he found it unusual that the car was traveling on County Road 36 because it was neither the

---

[7] Trooper Kuhn testified that before he initiated the traffic stop, he ran the vehicle's plates and discovered that the vehicle was registered to Theresa Jackson from Burnsville, MN. (Tr. 15).

most direct nor quickest route to Bemidji. (Tr. 20-21). The officer noted that Highway 200 to Highway 71 would have been the more direct route. (Tr. 21).

The officer then spoke to Ms. Cook who told him that "she had borrowed the vehicle from a friend."[8] (Tr. 19; see Gov't's Ex. 4, at 0:03:25-0:03:35). While speaking to Ms. Cook, Trooper Kuhn noticed that Defendant was not wearing his seatbelt. (Tr. 20; see Gov't's Ex. 4, at 0:04:40-0:05:13). After taking identification from Mr. Robinson, Ms. Cook, and Defendant, Trooper Kuhn went back to his vehicle to begin checking the three identification cards. (Tr. 26; Gov't's Ex. 4, at 0:05:20).

Deputy Nohre, having just arrived on the scene, (Tr. 26, 87), spoke briefly with Trooper Kuhn and was briefed on the situation. (Tr. 26-27, 87).  Deputy Nohre then saw the driver's side window roll up, which in his past experiences, often occurs when a vehicle's occupants are attempting to spray masking odors to hide the scent of illicit substances. (Tr. 87-88).  Deputy Nohre walked to the side of the Dodge Charger to speak to the driver. (Tr. 89; Gov't's Ex. 4, at 0:09:15). During his conversation, Deputy Nohre noticed that the driver refused to look at him, and he had a visible carotid pulse near his collar. (Tr. 89-90; Gov't's Ex 5, 0:7:20-0:7:23). Deputy Nohre also noticed the odor of marijuana emanating from the vehicle. (Tr. 91). The Deputy then asked Mr. Robinson to exit the vehicle and stand directly in front of Trooper Kuhn's vehicle where the Trooper was still performing his ID checks on the computer. (Tr. 93; Gov't's Ex. 4, at 0:11:05).

During his interaction with the driver, Deputy Nohre asked Mr. Robinson why he was so nervous and further questioned him as to where the group was going. (Gov't's Ex. 4, at 0:11:25). At this time, Mr. Robinson expressed concern about gunshots heard nearby from someone's

---

[8] It was around his time that a second officer, Deputy Nohre of the Hubbard County Sheriff's Office, arrived on the scene. (Tr. 87; see Gov't's Ex. 4, at 0:04:35-0:06:08).

public or private shooting range. (Gov't's Ex. 5, at 0:05:40). Deputy Nohre noted Mr. Robinson displayed accelerated speech patterns during this conversation. (Tr. 93). During the conversation between Deputy Nohre and Mr. Robinson, Trooper Kuhn exited his vehicle and joined the pair in front of his squad car where they all talked briefly. (Tr. 93). Deputy Nohre then returned to the Dodge Charger and spoke with the occupants of the vehicle starting with Ms. Reese, the front seat passenger. (Tr. 94). Trooper Kuhn continued to talk to Mr. Robinson in front of his squad car. (Gov't's Ex. 4, at 0:13:31).

During this conversation, Trooper Kuhn requested that Mr. Robinson take off his sunglasses to see if Mr. Robinson had any indicators of impairment.[9] (Tr. 28; Gov't's Ex. 4, at 0:13:40).  The officer testified that Mr. Robinson's eyes were "glossy and watery;" his "pupils were constricted;" and, when his eyes were closed, he had "eyelid flutters or tremors." (Tr. 28; see Gov't's Ex. 4, at 0:13:55). Furthermore Mr. Robinson had trouble answering basic questions such as remembering the name of his "buddy" in the back seat of the vehicle, the name of Ms. Cook, and where the group's destination was. (Tr. 30-31; Gov't's Ex. 4, at 0:14:20, 0:17:45). Trooper Kuhn testified that based on his training and experience, these symptoms and the observed behaviors were indicative of controlled substance use, specifically THC. (Tr. 29).

While further asking Mr. Robinson as to whether there were any illicit substances in the vehicle, Mr. Robinson suddenly stated that he urgently needed to urinate, and he asked if he could go into the woods. (Gov't's Ex. 4, at 0:16:20; see Tr. 33-34). After a few more questions, of Mr. Robinson, Trooper Kuhn then went back to the Dodge Charger to confer with Deputy Nohre who was talking with the car's occupants, and to ask the other occupants some questions about what was the group's destination. (Tr. 32; Gov't's Ex. 4, at 0:18:40). During this meeting next to the Dodge Charger, Deputy Nohre informed Trooper Kuhn that he had smelled the odor

---

[9] The Court notes from the video captured in Gov't's Ex. 4 and 5 that during this traffic stop, the sky was overcast.

of marijuana in the car. (Tr. 32; Gov't's Ex. 4, at 0:19:50). Trooper Kuhn returned to Mr. Robinson who was still standing in front of the squad car to ask him about whether there was any marijuana in the vehicle. (Tr. 33).

After Trooper Kuhn returned to Mr. Robinson, Deputy Nohre then asked Ms. Cook to exit the vehicle so that he could talk to her. (Tr. 95; Gov't's Ex. 4, at 0:19:50). Ms. Cook exited the vehicle, and she asked if the group should just drive away and leave (presumably without Mr. Robinson). (Tr. 95; Gov't's Ex. 4, at 0:25:05-0:27:00; Gov't's Ex. 5, at 0:20:10-0:22:45). Deputy Nohre further questioned Ms. Cook regarding the presence of marijuana in the vehicle at which point the Defendant said to Deputy Nohre that he had used marijuana recently during an earlier stop. (Tr. 96). Because Ms. Cook had an infant, Deputy Nohre decided to have her remove her child from the Dodge Charger and sit in the rear of Trooper Kuhn's squad car. (Tr. 97). To aid the mother, Deputy Nohre allowed Ms. Cook to take some of her items out of the Dodge Charger. (Id.). Ms. Cook was allowed to take a car seat, a container of baby formula, and other infant-related items such as a bay bottle with milk or formula in it and a blanket placed in the car seat.[10] (Tr. 46, 53, 97; Gov't's Ex. 4, at 0:27:00; Gov't's Ex. 5, at 0:22:45; Gov't's Ex. 1; Gov't's Ex. 2). Ms. Cook, along with her infant, then walked to Trooper Kuhn's vehicle. (Gov't's Ex. 5, at 0:24:46).

While Deputy Nohre was speaking with Ms. Cook, Trooper Kuhn had returned to Mr. Robinson, who was still in front of the Trooper's squad car. (Tr. 33; Gov't's Ex. 4, at 0:20:24). Mr. Robinson then renewed his request to urinate in the woods. (Id.). Trooper Kuhn informed Mr. Robinson that he would not be allowed to go into the woods, but he could urinate behind the privacy of an opened door of the Trooper's vehicle. (Tr. 34; Gov't's Ex. 4, at 0:20:35-0:20:54).

---

[10] During his testimony, Trooper Kuhn stated that he thought it was unusual that Ms. Cook took the container of powdered formula from the Charger when she already had a baby bottle with milk or formula in her hand. (Tr. 53).

Trooper Kuhn testified that he could observe Mr. Robinson's feet under the opened car door as he was allegedly urinating. (Tr. 34). After waiting roughly 2.5 minutes, Trooper Kuhn went to check on Mr. Robinson who had still not yet urinated. (Tr. 34-35; <u>see</u> Gov't Ex. 5, at 0:16:30-0:19:00). According to Trooper Kuhn, when he returned to check on Mr. Robinson, he observed a green metal straw next to his feet which the officer recognized as an item commonly used to smoke controlled substances. (Tr. 35-36).

Trooper Kuhn asked Mr. Robinson if the metal straw was his; Mr. Robinson confirmed that it was, and that he used it to smoke THC wax.[11] (Tr. 36-37; <u>see</u> Gov't Ex. 4, at 0:23:20). Upon learning this, the Officer then took out his flashlight to check Mr. Robinson's pupil response. (Gov't Ex. 4, at 0:23:40). The officer testified that Mr. Robinson's eyes had no response to the officer's flashlight. (Tr. 29). Trooper Kuhn then had Mr. Robinson perform several field sobriety tests which he failed.[12] (Tr. 38-42; Gov't Ex. 4, at 0:19:00-0:25:13). Thereafter, Mr. Robinson was asked "if he had anything on him," and if he was willing to empty his pockets. (Tr. 43; Gov't Ex. 4, at 0:37:40). Mr. Robinson pulled from his pockets cash and a "green microbaggie" which contained a white residue that, based on his training and experience, appeared consistent with methamphetamine. (Tr. 43; Gov't Ex. 4, at 0:37:45). At this point, Trooper Kuhn placed Mr. Robinson under arrest for possession of a controlled substance and driving under the influence. (Tr. 44; Gov't Ex. 4, at 0:39:25).

Following Mr. Robinson's arrest, the Defendant was asked to exit the vehicle so that the vehicle could be searched. (Tr. 46; Gov't Ex. 4, at 0:43:27). Upon exiting, the Defendant was

---

[11] Mr. Robinson referred to the substance as "dabs" which, as Trooper Kuhn testified, is slang for THC wax. (Tr. 42).

[12] Trooper Kuhn administered the horizontal gaze nystagmus test which Mr. Robinson struggled to complete, the nine-step walk and turn which Mr. Robinson failed to maintain his balance and follow instructions, the one-leg stand test which Mr. Robinson demonstrated very poor balance along with rapid counting, and finally, the modified Romberg balance test which Mr. Robinson struggled to follow the instructions of but ultimately was able to complete. (Tr. 38-42; <u>see</u> Gov't Ex. 5, at 0:26:30-0:28:40, 0:28:53-0:31:35, 0:33:20-0:33:59, 0:34:11-0:36:10). Based on the results of all four tests, the Trooper determined that Mr. Robinson was impaired. (Tr. 44).

then briefly patted down for weapons and asked to stand in front of the Troopers squad car. (Tr. 47; Gov't's Ex. 4, at 0:45:20). Ms. Reese was then also asked to exit the vehicle and wait beside where the Defendant was standing. (Tr. 47; Gov't's Ex. 4, at 0:45:45).

While searching the passenger compartment of the car, Trooper Kuhn testified that he found what he believed to be a bag of marijuana, a red metal straw, a methamphetamine pipe, a series of plastic cups containing what appeared to be methamphetamine, a plastic container that contained methamphetamine pipe scrapings, and rubber latex gloves of the type often used to handle fentanyl. (Tr. 49-50). These items were found in Ms. Reese's purse located in the car and she was subsequently arrested for possession of controlled substances. (Tr. 50; Gov't's Ex. 4, at 0:51:05).

Trooper Kuhn testified that he then moved his search on to the truck of the car where he found a plastic container that contained white powder which, in the officer's training and experience, was consistent with a "cutting agent" typically added to fentanyl. (Tr. 50-51). Upon finding this, Trooper Kuhn then went to the back seat of his squad car to examine the infant-related items that Ms. Cook had taken from the vehicle with Deputy Nohre's permission.[13] (Tr. 52; Gov't's Ex. 5, at 1:25:00). The officers examined the car seat and the infant's formula container. (Tr. 52; Gov't's Ex. 5, at 1:25:00, 1:26:30).

In the baby's formula container, Trooper Kuhn found a plastic bag of what he believed to be fentanyl. (Tr. 53; Gov't's Ex. 2; Gov't's Ex. 5, at 1:26:15). In the car seat, Trooper Kuhn found marijuana, a container of pills believed to be the prescription drug gabapentin, and roughly $5,000 in cash. (Tr. 54; Gov't's Ex. 1; Gov't's Ex. 5, at 1:42:05). Ms. Cook and the Defendant (who were the mother and father of the infant) were then arrested for possession of a controlled substance and child endangerment. (Tr. 55).

---

[13] See, fn. 10, supra.

After informing him of why he was under arrest, the Defendant was then searched incident arrest. (Tr. 57). During this search, Trooper Kuhn testified that he could feel a hard object stored around Defendant's crotch area, and upon discovering this object, Defendant began to resist arrest. (Tr. 57; Gov't Ex. 5, at 1:33:05-1:34:00). According to Trooper Kuhn, it took the assistance of additional deputies, who by now had arrived on the scene, to secure the Defendant in a squad vehicle. Inside Defendant's pants was a Ziplock-style bag containing 398 grams of what was believed to be fentanyl. (Tr. 58; Gov't Ex. 3).

Defendant was charged with one (1) count of conspiracy to possess with intent to distribute fentanyl in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846. (Indictment [Docket No. 1]).

### B.  Standard of Review

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and that "no warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. Amend. IV. "Probable cause is a fluid concept that focuses on 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" United States v. Colbert, 605 F.3d 573, 576 (8th Cir. 2010) (quoting Illinois v. Gates, 462 U.S. 213, 231 (1983)). Courts use a "totality of the circumstances test . . . to determine whether probable cause exists." United States v. Hager, 710 F.3d 830, 836 (8th Cir. 2013) (citation omitted).

### C.  Analysis of Extension of Stop and Search of the Vehicle

Defendant asserts by his motion to suppress that the initial traffic stop was impermissibly extended into the search of the vehicle and its occupants, and this impermissible extension ultimately led to the arrest of Mr. Johnson.

The Court considers the totality of the circumstances, based on common sense judgments and inferences about human behavior, when determining whether an officer had "at least a minimal level of objective justification" for prolonging a traffic stop. United States v. Stringer, 739 F.3d 391, 395 (8th Cir. 2014) (citing Illinois v. Wardlow, 528 U.S. 119, 125 (2000)). Defendant contends that the extension of the stop into the ultimate search of the vehicle, which culminated with the arrest of the driver and multiple passengers, including the Defendant, was conducted absent probable cause. (Defendant's Motion to Suppress Search and Seizure [Docket No. 31] ¶¶ 3-4; Defendant's Memorandum in Support of Motion to Suppress Evidence [Docket No. 41] at 1). He argues, therefore, that all evidence obtained from the unlawful search must be suppressed. Utah v. Strieff, 579 U.S. 232, 237 (2016).

### 1. The Initial Traffic Stop

While Defendant does not challenge the validity of the initial traffic stop, the record before the Court clearly indicates that Trooper Kuhn had reasonable, articulable suspicion to initiate a traffic stop of the Dodge Charger. Trooper Kuhn testified that the Dodge Charger was traveling 70 miles per hour in a zone with a posted speed limit of 55 miles per hour in violation of Minn. Stat. Ann. § 169.24(2). The Eighth Circuit Court of Appeals has repeatedly held that any traffic violation, no matter how minor, will provide at least a reasonable, articulable basis to justify a traffic stop. United States v. Houston, 548 F.3d 1151, 1153 (8th Cir. 2008). Accordingly, the Court finds that Trooper Kuhn had reasonable suspicion to initiate a traffic stop of the Dodge Charger.

If, during a traffic stop, an officer develops reasonable, articulable suspicion that criminal activity has occurred or is occurring, "he has 'justification for a greater intrusion unrelated to the traffic' offense." United States v. Sanchez, 417 F.3d 971, 975 (8th Cir. 2005) (quoting

Bloomfield, 40 F.3d at 918, 923 (8th Cir. 1994)). To put this in another way, to "extend a routine traffic stop, the officer needs reasonable suspicion of additional criminal activity." United States v. Callison, 2 F.4th 1128, 1132 (8th Cir. 2021); see United States v. Long, 320 F.3d 795, 800 (8th Cir. 2003) ("an investigative stop can grow out of a traffic stop as the officer has reasonable suspicion to expand his investigation, even if his suspicions are unrelated to the traffic offense that served as the basis for the stop."). Reasonable suspicion is determined based on "the 'totality of the circumstances' of each case," and exists when "the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." United States v. Arvizu, 534 U.S. 266, 273 (2002). But "[r]easonable suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." United States v. Mosley, 878 F.3d 246, 251 (8th Cir. 2017).

 "Whether an officer has reasonable suspicion to expand the scope of a stop is determined by looking at 'the totality of the circumstances, in light of the officer's experience.'" Sanchez, 417 F.3d at 975 (quoting United States v. Carrate, 122 F.3d 666, 668 (8th Cir. 1997)). "[T]he proper scope of an investigative detention depends upon the purposes of the stop and requires using the least intrusive means reasonably available to achieve those purposes." United States v. Doffin, 791 F.2d 118, 120 (8th Cir. 1986), cert. denied, 479 U.S. 861 (citing United States v. Jones, 759 F.2d 633, 642 (8th Cir. 1985)).

Here, while initially speaking to the driver during the traffic stop, Trooper Kuhn informed the driver, and the overhearing vehicle passengers, of why they were stopped, asked the driver where he was driving from and what was his destination, and he asked for the driver's and occupants' license and insurance information. Trooper Kuhn was permitted to make these inquiries. See United States v. Gregory, 302 F.3d 805, 809 (8th Cir. 2002) (quoting United

States v. Linkous, 285 F.3d 716, 719 (8th Cir. 2002) (holding that "[t]he Fourth Amendment grants an officer conducting a routine traffic stop latitude to check the driver's identification and vehicle registration, ask the driver to step out of the vehicle and over to the patrol car, inquire into the driver's destination and purpose for the trip, and 'undertake similar questioning of the vehicle's occupants to verify the information provided by the driver.'")).

Further, Trooper Kuhn, and the other responding law enforcement officers, were permitted to ask, the driver, Mr. Robinson to step out of the vehicle. "Officers who have conducted a lawful Terry stop of a vehicle may order the driver to exit the vehicle pending completion of the stop." United States v. Spotts, 275 F.3d 714, 719 n. 2 (8th Cir. 2002); see also United States v. Payne, 534 F.3d 948, 951 (8th Cir. 2008) (providing that a traffic stop can last as long as reasonably necessary to conduct a criminal history check; conduct computer searches to verify driver information; and conduct a routine investigation, including asking the driver his destination, inquiring into the purpose of his trip, and asking him to step out of the vehicle).

### 2. The Reasonable Suspicion to Extend the Initial Stop

Trooper Kuhn testified that when he first made contact with the driver, he noticed that Mr. Robinson was "tapping his leg up and down," had a visible "carotid pulse in his neck," had "rapid, accelerated speech," and was "unsure in some of his answers." The officer testified that in his experience, Mr. Robinson displayed behavior unusual for being stopped for speeding, and the officer suspected the driver may have been intoxicated.[14]

The Eight Circuit has stated that generally, nervousness is of "limited significance in determining reasonable suspicion." United States v. Jones, 269 F.3d 919, 928 (8th Cir. 2001) (quotations omitted). However, that does not mean that a driver's behavior cannot be the basis

---

[14] The defendant asserts that his nervousness was due to him overhearing gunshots from what sounds like either a public or private gun range in the distance. The sounds can be heard throughout Gov't's Ex 4 and 5.

for an officer's reasonable suspicion required to extend a stop. But, "actions that characterize a very large category of presumably innocent travelers will not meet the standard." Callison, 2 F.4th at 1132 (internal quotations removed).

The Eighth Circuit has noted that nervousness in combination with other factors can help support reasonable suspicion: (1) unusual driving behavior, see United States v. Walker, 555 F.3d 716, 720 (8th Cir. 2009); (2) attempts to evade officers, see United States v. Noonan , 745 F.3d 934, 936 (8th Cir. 2014); (3) indirect or incomplete answers to officer questions, see Murillo-Salgado, 854 F.3d 407, 416 (8th Cir. 2017); (4) nervousness and lack of eye contact, see United States v. Foley, 206 F.3d 802, 804, 806 (8th Cir. 2000); and (5) "seeming implausibilities and inconsistencies in the responses to [an officer's] routine questions" about travel plans. See United States v. Hogan, 539 F.3d 916, 919, 921 (8th Cir. 2008). The Court in Callison, supra, held that because of the driver's inability to remember key names of his passengers, inconsistent answers, lack of eye contact, and general nervousness were enough to support a reasonable suspicion to extend the stop. Callison, 2 F.4th at 1133.

In the present case, the driver, Mr. Robinson, displayed general nervousness and unusual vocal patterns. Furthermore, Mr. Robinson could not recall the names of his passengers; one of which he described as his "buddy." Mr. Robinson was also unsure of the group's destination after dropping some of the passengers off at Bemidji. The group was not traveling on the quickest and most direct route to Bemidji, but instead, they were taking an unusual path through the back country roads.[15] Finally the car had a strong order of an artificial scent like an air freshener,[16] and it did not actually belong to any of the occupants despite the driver initially

---

[15] According to the Officer's experience, vehicles used to transport contraband will often travel on backroads as opposed to the highway or interstate to reduce the chances of encountering law enforcement. (Tr. 21).

[16] Drug traffickers often use abnormally large amounts of scented agents to try to mask the odors of contraband from law enforcement. (Tr. 23).

telling the Officers that the car belonged to one of the passengers.[17] The Court finds that given the totality of the officer's observations, Trooper Kuhn had reasonable suspicion to extend the traffic stop.[18]

### 3. The Diligence and Reasonableness of Officers' Subsequent Investigation During the Initial Extension.

The Court notes that the officers were not particularly expedient to begin Mr. Robinson's field sobriety tests. After asking Mr. Robinson to exit his vehicle and asking him several questions, the officers had Mr. Robinson wait in front of Trooper Kuhn's squad car. There was a period of approximately nine minutes between the point where Trooper Kuhn ceased to check IDs and the point where Trooper Kuhn returned Mr. Robinson after speaking with other occupants of the stopped car.

However, the officers already had a reasonable suspicion to extend the traffic stop by this time. In light of the officer's reasonable suspicion to extend the stop, the officers were free to choose the order and pace in which they conducted their investigation provided they "pursu[e] [the] investigation in a diligent and reasonable manner." United States v. Sharpe, 470 U.S. 675, 687 (1985). The investigation now at issue here comports with other investigations upheld in the Eighth Circuit.

In Payne, the traffic stop lasted approximately thirty minutes. Payne, 534 F.3d at 951. In Allegree, there was a period of approximately fifteen minutes between the initial stop and the

---

[17] The Officers testified that vehicles used to transport contraband are often borrowed or stolen. (Tr. 17-18).

[18] The Court finds the officers' reasoning that fast food wrappers were on the floor of the car as the type of evidence contemplated by Callison that is characteristic of a very large category of travelers and is therefore not adequate to support a finding of reasonable suspicion. The Eighth Circuit has held that the mere presence of food wrappers in a vehicle is entirely consistent with innocent travel. United States v. Beck, 140 F.3d 1129 (8th Cir. 1998); United States v. Wood, 106 F.3d 942, 947 (10th Cir. 1997) (holding that the suspicion associated with the possession of fast-food trash "is virtually nonexistent"); Karnes v. Skrutski, 62 F.3d 485, 496 (3rd Cir. 1995) (noting that fast-food wrappers "have become ubiquitous in modern interstate travel and do not serve to separate the suspicious from the innocent traveler."). However, the other evidence that the officers testified to regarding this issue does meet the Callison standard.

vehicle search. <u>United States v. Allegree</u>, 175 F.3d 648, 649 (8th Cir. 1999). Here the officers conferred with each other and spoke with the other passengers in the stopped vehicle for a period of only nine (9) minutes before returning to the driver, Mr. Robinson. It is during this time that Deputy Nohre informed Trooper Kuhn that he smelled marijuana in the vehicle.[19] However, much like in <u>Allegree</u>, <u>supra</u>, it appears that the officers already had a reasonable suspicion that Mr. Robinson was impaired based on his unusual behavior.

It should be noted that the Supreme Court has <u>rejected</u> the notion that de minimis extensions on traffic stops could comport with the Fourth Amendment. <u>Rodriguez v. United States</u>, 575 U.S. 348, 353 (2015). A seizure remains lawful only "so long as unrelated inquiries do not measurably extend the duration of the stop. <u>Id.</u> at 355 (quoting <u>Arizona v. Johnson</u>, 555 U.S. 323, 333 (2009)). However, unlike in <u>Rodriguez</u> and <u>Johnson</u>, the officers in the present matter had the prerequisite reasonable suspicion of impaired driving needed to extend the stop before starting their investigations.[20] Importantly, there is no evidence or argument that the officers were purposefully delaying the traffic stop and related tasks.

This Court finds that the officers' actions of first talking to the car occupants before returning to Mr. Robinson to administer his field sobriety test was not unreasonable and was diligent given the totality of the circumstances.

---

[19] Deputy Nohre was authorized to approach the vehicle and ask the occupants questions during the time that Trooper Kuhn was checking IDs because such actions by the second Trooper did not <u>extend</u> the stop. The situation is analogous to <u>Illinois v. Caballes</u> where the Supreme Court upheld that a dog sniff around a car did not extend a traffic stop. <u>Illinois v. Caballes</u>, 543 U.S. 407, 410 (2005).

[20] In <u>Rodriguez</u>, after the officer had attended to everything related to the traffic stop (including checking driver's licenses and issuing a warning for the traffic offense), the officer asked to walk his dog around the car. Rodriguez refused and was detained, and seven minutes later the dog alerted to a scent. The ensuing search of the vehicle revealed methamphetamine. In <u>Johnson</u>, the officer stopped a vehicle for a minor driving infraction. After issuing the citation to the driver, the officer continued his investigation despite having no reason to suspect the vehicle's occupants of criminal activity. After learning that Johnson was from a town with a Crips gang and had been in prison, the officer asked him to get out of the car and patted Johnson down. During this patdown, the officer felt a gun, which led to Johnson's arrest.

#### 4. The Officers' Reasonable Suspicion for the Field Sobriety Test and Probable Cause for Mr. Robinson's Arrest.

As for the field sobriety test itself, the Court finds that Trooper Kuhn had reasonable, articulable suspicion to believe that Mr. Robinson was driving while impaired under the influence of drugs, warranting a field sobriety test for all the reasons stated above. In addition, before the field-sobriety test, Mr. Robinson attempted to dispose of drug paraphernalia while allegedly urinating, as well as, the general observations of his behavior throughout the traffic stop. See United States v. Rekonnen, No. 07-cr-123 (JNE/RLE), 2007 WL 2973840, at * 15 (D. Minn. Oct. 9, 2007) (concluding that an officer had reasonable suspicion to conduct field sobriety tests despite the fact that he did not smell alcohol on the defendant).

After failing the field sobriety tests, Trooper Kuhn had probable cause to believe that Mr. Robinson was in possession of a controlled substance and was driving under the influence.

#### 5. The Officers' Probable Cause to Search the Vehicle

Moving on to the subsequent search of the car after Mr. Robinson's arrest. While "[a] citizen does not surrender all the protections of the Fourth Amendment by entering an automobile," the Courts are quite clear on the distinction between a "particularized suspicion" to make an investigatory stop and "probable cause" to search a vehicle. New York v. Class, 475 U.S. 106, 112, (1986); United States v. Neumann, 183 F.3d 753, 756 (8th Cir. 1999). Police may search a car without a warrant if they have probable cause to believe that the car contains contraband or evidence of a crime. United States v. Payne, 119 F.3d 637, 642 (8th Cir. 1997). Probable cause requires "only a probability or substantial chance of criminal activity, not an actual showing of such activity." See Payne, 119 F.3d at 642 (quoting Illinois v. Gates, 462 U.S. 213, 243-44 n.13 (1983)). "Probable cause is established when, considering the totality of the circumstances, there is sufficient evidence to cause a reasonably prudent person to believe that a

search will uncover evidence of a crime." United States v. Harris, 464 F.3d 733, 738 (7th Cir. 2006) (citing Gates, 462 U.S. 213, 238 (1983)).

Here, given the suspicious nature of the ownership of the car, the fact it was traveling to Bemidji on a country road which took the occupants many miles out of their way;[21] with a strong odor of a masking agent emanating from the vehicle; the odor of marijuana inside the vehicle; the Defendant's spontaneous statement that he had smoked marijuana during an earlier rest stop by the vehicle; the bag of methamphetamine discovered on the driver;[22] and the fact that the driver tried to furtively dispose of other drug paraphernalia, Trooper Kuhn, under the totality of the circumstances, had probable cause that the vehicle was being used for drug trafficking and that other evidence of such offense would be found within the vehicle. Thus, given the totality of the circumstances surrounding the events that led to the Defendant's arrest, this Court concludes that the observations of Trooper Kuhn, after performing a lawful traffic stop are independent and articulable facts that created an objectively reasonable suspicion of additional criminal activity sufficient to extend the stop, and probable cause to search the vehicle and its contents.[23]

Accordingly, for the reasons articulated herein, it is recommended that Defendant's Motion to Suppress Search and Seizure, [Docket No. 31], seeking an Order of this Court

---

[21] Trooper Kuhn testified that drug traffickers in the area often attempt to avoid police detection by traveling on back-roads believing these roads to avoid contact with law enforcement. In the present case, the most direct and quickest route to Bemidji would have been traveling Highway 71. (Tr. 21).

[22] This was discovered incident to Mr. Robinson's arrest for driving while impaired and before the search of the stopped vehicle.

[23] As for the infant care items that were removed from the car by Ms. Cook, the Fourth Amendment permits a brief detention of property on the basis of only "reasonable, articulable suspicion" that it contains contraband or evidence of criminal activity. Smith v. Ohio, 494 U.S. 541 (1990) (quoting United States v. Place, 462 U.S. 699, 702 (1983)). Officers are entitled to search a passenger's belongings without probable cause to search those specific items because they have probable cause to believe the vehicle contained contraband. Wyo. v. Houghton, 526 U.S. 295, 304 (1999). This is because a criminal could hide contraband in a passenger's belongings as readily as in other containers in the car. Rawlings v. Kentucky, 448 U.S. 98, 102 (1980). The infant care items were taken from the car by Ms. Cook in the officer's presence for the purpose of providing care to the infant while the vehicle was searched and thus were part of the passenger's belongings. In addition, it was unusual that Ms. Cook took the container of formula despite already possessing a premade baby bottle in her hand. (Tr. 53). This is not contested in Defendant's Motion. (Defendant's Motion to Suppress Search and Seizure [Docket No. 31]; Defendant's Memorandum in Support of Motion to Suppress Evidence [Docket No. 41]).

suppressing evidence flowing from the stop and search of the vehicle on June 2, 2022, be **DENIED**.

### D.  Analysis of the Search of Defendant's Person Before and After his Arrest

As for the subsequent arrest of the Defendant, Trooper Kuhn was constitutionally permitted to conduct a <u>Terry</u> pat-down for safety under the circumstances before arresting Mr. Johnson.  See <u>Terry v. Ohio</u>, 392 U.S. 1 (1968); <u>see also</u> <u>Navarrete-Barron</u>, 192 F.3d 790-91 (8th Cir. 1999). Once Defendant was placed under arrest, the subsequent search of his person was lawful. It is well settled that a search incident to a lawful arrest is a traditional exception to the warrant requirement of U.S. Const. amend. IV.

 Courts have consistently held that a search may be made of the person of the arrestee by virtue of the lawful arrest. <u>United States v. Robinson</u>, 414 U.S. 218, 219 (1973) (citing <u>Carroll v. United States</u>, 267 U.S. 132 (1925); <u>Marron v. United States</u>, 275 U.S. 192 (1927); <u>Go-Bart Co. v. United States</u>, 282 U.S. 344 (1931); <u>United States v. Lefkowitz</u>, 285 U.S. 452 (1932); <u>Preston v. United States</u>, 376 U.S. 364 (1964)).  "When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction." <u>United States v. Robinson</u>, 414 U.S. 218, 226 (1973) (quoting <u>Chimel v. California</u>, 395 U.S. 752, 762-63 (1969)).

Thus, this Court finds that the search of his person after Defendant Johnson's arrest, which resulted in law enforcement discovering a bag of 398 grams of fentanyl between the

Defendant's legs, was permissible under the search incident to a lawful arrest exception to the Constitution's Fourth Amendment.

Accordingly, to the extent Defendant's Motion to Suppress Search and Seizure, [Docket No. 31], seeks an Order of this Court suppressing evidence flowing from the search of Mr. Johnson following his arrest on June 2, 2022, the undersigned recommends that Defendant's Motion to Suppress Search and Seizure, [Docket No. 31], be **DENIED**.

## IX.    Conclusion

Thus, based on the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT**:

1. The Government's Motion for Discovery, [Docket No. 20], is **GRANTED**, as set forth above;

2. Defendant's Motion for Disclosure of 404 Evidence, [Docket No. 26], is **GRANTED**, as set forth above;

3. Defendant's Motion to Compel Attorney for the Government to Disclose Evidence Favorable to the Defendant, [Docket No. 27], is **GRANTED**, as set forth above;

4. Defendant's Pretrial Motion to Disclose and Make Informants Available for Interview, [Docket No. 28], is **DENIED** as set forth above;

5. Defendant's Motion for Disclosure of Early Jencks Act Material, [Docket No. 29], is **DENIED**; and

6. Defendant's Pretrial Motion for Government Agents to Retain Rough Notes and Evidence, [Docket No. 30]; is **GRANTED**, as set forth above.

Further, **IT IS HEREBY RECOMMENDED THAT**:

1. Defendant's Motion to Suppress Search and Seizure, [Docket No. 31], be **DENIED**.

Dated: October 5, 2023                          _s/ Leo I. Brisbois_____

                                                Hon. Leo I. Brisbois
                                                U.S. MAGISTRATE JUDGE

**N O T I C E**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]" A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.